IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-950

Filed: 7 July 2020

Lenoir County, No. 16 CRS 51778

STATE OF NORTH CAROLINA

v.

DAVID BRANDON LEE

Appeal by defendant from judgment entered 30 November 2018 by Judge William W. Bland in Lenoir County Superior Court. Heard in the Court of Appeals 31 March 2020.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General K.D. Sturgis, for the State.*
>
> *Law Office of Lisa Miles, by Lisa Miles, for defendant.*

DIETZ, Judge.

Defendant David Brandon Lee confessed to killing his aunt. On appeal from his first degree murder conviction, Lee challenges the denial of his motion to suppress that confession. He argues that his confession was involuntary because he gave it in exchange for a promise that law enforcement officers would arrange for him to meet face-to-face with his family.

As explained below, the trial court properly denied the motion to suppress. Viewing the totality of the circumstances, Lee's confession was knowing and

voluntary and not the result of an improper inducement by the officers. The arrangement was Lee's idea—he suggested it after learning that he would only see his family through a computer monitor while in jail, and after his father spoke to him on the telephone and urged him to tell the officers what happened that night. Throughout the process, the officers complied with the procedural safeguards required by *Miranda* and ensured that Lee was able to make a knowing and voluntary decision to confess. We therefore find no error in the trial court's judgment.

**Facts and Procedural History**

In 2016, David Brandon Lee lived with his aunt, Trudy Howard Smith. Lee is a longtime drug addict, and Smith had previously kicked Lee out of her home after he stole her prescription medications. On 5 August 2016, Lee picked up Smith's prescriptions for OxyContin and oxycodone at the pharmacy. Lee had spent the previous two weeks doing drugs, including cocaine, heroin, and "pills." Later that evening, Lee told an acquaintance, Jason Henderson, that he had just shot and killed his aunt. Henderson reported what Lee told him to law enforcement.

Officers then went to Smith's home and found her body. An autopsy confirmed two gunshot wounds as the cause of death. Police did not find Smith's OxyContin or oxycodone prescriptions inside the house. Further investigation confirmed that Lee had picked up those prescriptions earlier that day.

The next day, police arrested Lee, took him into custody, and placed him in an interview room at the sheriff's office. One of the officers present, Detective Ronald Farris, testified that when they brought Lee in, he was slurring his speech and appeared to be high. Lee admitted to the officers that he had taken oxycodone. After speaking briefly with Detective Farris, Lee asked for a lawyer. At that point, Detective Farris ended the interrogation.

Two days later, Lee sent a letter to the sheriff's office asking to speak with an officer. Before sending the note, Lee had spoken to his father on the telephone and his father told him to "just tell them what you know, son." Lee also was frustrated that he was only able to speak to his family on the telephone or through a "computer monitor" and wanted the opportunity to see his family face-to-face.

Detective Aaron Shambeau met with Lee in the interrogation room, read Lee his *Miranda* rights, and presented Lee with a *Miranda* waiver form, which Lee signed. Lee told Detective Shambeau that he knew he was going to prison and believed he would never get out again, so he wanted to see his family face-to-face one last time. Then, Lee said he was willing to tell police "whatever you want to know" but that he wanted to see his family and "hug them goodbye." Lee stated, "If I can do that, I'll tell you whatever you want to know."

Initially, Detective Shambeau cautioned Lee that he could not promise him anything. Detective Shambeau also told Lee that "we can't say for certain what your

sentence will be," sentencing is "a long time away," and "there's gonna be plenty of opportunities to talk your parents" during jail visitation and in court. After consulting with his superior officer, Detective Shambeau told Lee that he would arrange for him to meet with his family "face-to face, as long as they want to," but that Lee would have to "tell everything, every detail, and don't leave out anything." Lee replied that he felt like the officers were "the only hope" he had of seeing his family again and that he believed he was doing the right thing. Lee then confessed to his aunt's murder, explaining that he thought he could just "knock her out" and take the pills.

Lee went to trial on a charge of first degree murder. He moved to suppress the videotape of his confession, but the trial court denied the motion in an oral ruling at a hearing shortly before trial. The jury found Lee guilty of first degree murder based on premeditation and deliberation. The trial court sentenced Lee to life in prison without the possibility of parole. Lee appealed.

**Analysis**

Lee's sole argument on appeal is that the trial court erred in declining to suppress his videotaped confession to police.

"The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Huddy*, 253 N.C. App. 148, 151, 799 S.E.2d 650, 654 (2017). This standard presupposes findings of fact but

where, as here, the parties agree that there is no conflicting evidence, "we infer the findings from the trial court's decision and conduct a de novo assessment of whether those findings support the ultimate legal conclusion reached by the trial court." *State v. Nicholson*, 371 N.C. 284, 288, 813 S.E.2d 840, 843 (2018).

Lee argues that his confession should have been suppressed because law enforcement officers induced him to speak by promising that he could see his family if he confessed. This inducement, Lee contends, meant his decision to waive his constitutional rights and speak the officers was not a knowing and voluntary one.

Due process protections guaranteed by the United State Constitution and the North Carolina Constitution prohibit the State from obtaining an in-custody confession from a defendant unless the defendant knowingly and voluntarily makes that confession. *State v. Pruitt*, 286 N.C. 442, 454, 212 S.E.2d 92, 100 (1975). Thus, even in cases where "the procedural safeguards required by the *Miranda* decision were recited by the officers and th[e] defendant signed a waiver stating that he understood his constitutional rights . . . the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly made." *Id.*

Applying these principles, our Supreme Court repeatedly has held that a confession obtained by the improper "influence of hope or fear implanted in defendant's mind" by law enforcement officers can render the confession involuntary.

*Id.* at 455, 212 S.E.2d at 100. But the Supreme Court also has held that not every promise or inducement in exchange for a confession renders the confession involuntary; the Court "has made it equally clear that any improper inducement generating hope must promise relief from the criminal charge to which the confession relates, not to any merely collateral advantage." *Id.* at 458, 212 S.E.2d at 102.

Moreover, in cases "in which the requirements of *Miranda* have been met and the defendant has not asserted the right to have counsel present during questioning, no single circumstance may be viewed in isolation as rendering a confession the product of improperly induced hope or fear and, therefore, involuntary." *State v. Corley*, 310 N.C. 40, 48, 311 S.E.2d 540, 545 (1984). "In determining whether a defendant's statement was in fact voluntarily and understandingly made, the court must consider the totality of the circumstances of the case and may not rely upon any one circumstance standing alone and in isolation." *Id.*

Viewing the totality of the circumstances in this case, there are many factors that distinguish it from cases involving unconstitutional inducements to confess. First, and most importantly, it was Lee, not the officers, who proposed that he would confess in exchange for seeing his family. Two days after his arrest, Lee sent a written note asking to speak to investigators. Lee explained that he expected to be convicted for the murder of his aunt and that he was willing to tell investigators "whatever you

want to know" but that he wanted to see his family face-to-face to say goodbye to them.

At the suppression hearing, Lee testified that he sent the note because he intended to condition his confession on law enforcement arranging a face-to-face meeting with his family:

> My initial reason – and I stated this to Detective Shambeau from the very beginning – was that my talking with him would be conditional on him arranging a meeting between me and my parents because I was fearful that I would never see them outside of the – be able to see them face-to-face. I had already been told that the – the visits at the jail were on a computer monitor, and I wanted to see them face-to-face.

Lee also explained that he had talked to his father on the telephone and his father told him to "just tell them what you know, son." Lee testified that his father's conversation with him had an impact and that "the right thing to do would be to tell what happened" but that he wanted to arrange to see his family as part of his agreement to do so:

> Well, there was a part of me that the felt the right thing to do would be to tell what happened. I – I remember making the comment: she deserves that much. She deserves for somebody to know what happened. But, again, my – it was clear from the very start that the only way I would speak with Detective Shambeau was if he were to arrange that meeting, and he told me it had been arranged.

Simply put, although the record shows that Lee's confession was made in exchange for the promise that he could see his family face-to-face, it also shows that

Lee's decision to agree to this exchange was knowing and voluntary. Indeed, it was Lee's idea; he contemplated it even before reaching out to the investigators, and he had other reasons for his decision to confess. He chose—in a reasoned, voluntary decision—to leverage his willingness to confess to get a face-to-face meeting with his family that otherwise would have occurred through a remote video meeting.

Moreover, as noted above, the Supreme Court held in *Pruitt* that "any improper inducement generating hope must promise relief from the criminal charge to which the confession relates, not to any merely collateral advantage." 286 N.C. at 458, 212 S.E.2d at 102. That did not occur here. The officers never proposed any relief from the charges against Lee. When Lee asked to see his family face-to-face in exchange for his confession, Detective Shambeau said he could not "promise" anything and he then consulted with a superior officer. After that consultation, Detective Shambeau told Lee that he would be able to arrange that face-to-face meeting if Lee would "tell everything." That is precisely what Lee initially proposed—the officers did not propose any additional terms or conditions that could have induced hope or fear that rendered Lee's intended confession involuntary. Accordingly, under *Pruitt*, the officers' proposal to arrange the family meeting in exchange for a confession was not the sort of improper inducement that renders the confession inadmissible. Accordingly, the trial court properly denied Lee's motion to suppress.

## Conclusion

We find no error in the trial court's judgment.

NO ERROR.

Judges BRYANT and ARROWOOD concur.